Beginning with the United States v. Marchetti, Mr. Turner. May it please the court, good morning, counsel for the government. I'm Jim Turner, and together with my colleague Cameron Powell, we represent Mr. Vincent Marchetti in this appeal for my conviction for conspiracy to commit illegal remunerations. So how many arguments is this for you, Mr. Turner, Fifth Circuit? You know, it's been a long time since I've been here. It has been a while, I thought. It used to be I was here every other month, I think I told Judge Parker that. So I'm thinking close to 60, with two en banc in between. But today I'm here on a different mode. I'm representing the appellants, and I must call to mind the Supreme Court earlier this year in the case of Dubin v. United States admonished judges that they should exercise restraint in assessing the reach of a federal criminal statute due to deference due to Congress and to ensure that the defendants receive fair notice of it. That issue is before us again today because in this case, the evidence offered is more consistent with the legal conduct than it is with the criminal conduct prohibited by the illicit, the anti-kickback statute. Secondly, the second and third issues we have today to bridge with you is the fact that the jury wasn't completely instructed with respect to what they could consider in assessing Mr. Marchetti's innocence or guilt. The judge denied a defense theory instruction, and he sent a construction on good faith reportedly from the Seventh Circuit, which is wholly erroneous because it was converted into a government in their closing arguments. The only party that actually used that good faith instruction at all was the doctor that was acquitted mainly because the evidence was clearly distinct. And finally, the third issue we have is, well, that's three issues we're going to raise today. Our position basically is the government did not offer any evidence that shows that Mr. Marchetti knowingly and voluntarily entered a conspiracy to commit illegal remunerations. He entered an agreement to engage in sales and marketing for Vansari Laboratories. And that's what he did precisely. It was for a straight percentage? Percentage of net revenue. Yes, sir. And so, the theory was, I believe the theory of the prosecution is that straight percentage commissions paid to sales and marketers is basically per se, and they basically created a presumption that we try to oppose it with a defense instruction, a trial to overcome that. There was no way without the instructions that Mr. Marchetti could, nor is there any evidence consistent with Miles and Shoemaker as construed by Judge Garza of any exercise of undue influence. In fact, the agent, special agent testified that he could find no payments to doctors and there was no other evidence offered with respect to any undue influence. In fact, the government basically proceeded from the premise that Marchetti and his firm were hired because they had access to doctors and influence over. But there was no showing that access resulted in any illicit conduct. And in context, the statute says illicit remuneration, so at some point, there has to be a showing of illicit conduct. And here, there is none. None at all. They tried to show, I believe, they went through the contracts were modified because the firm, Bontari Firm, Bontari Firm, specifically Phil Lamb, wanted to become compliant. So this entire case became a discussion of compliance with the safe harbor provision, which isn't specifically mentioned, which in and of itself raises a potential issue of . . . Well, it's not just compliance. I mean, Lamb told Marchetti what we're doing violates the law. That's what he said. It's a matter of law. But it's not. And then at the same time, Nicholas Arroyo was saying it doesn't violate the law. And at the same time, the safe harbor provision says that it's not . . . it may implicate the anti-kickback statute. What do we do when they renegotiate the agreement and under the table, they're basically keeping the old agreement, which was referral-based, right? In other words, it was a percentage . . . It's a sales and marketing percentage-based, but yes, sir. But that was still consistent with the fact that Mr. Marchetti's belief, and he had that he wasn't violating the anti-kickback statute. He was simply doing marketing activity. So it's a shady deal, but not an anti-kickback deal. Not an anti-kickback deal. And it was based on the number of patients that were referred or the number of cases referred to Ventari. And it was . . . yeah, and there was really nothing to show that there was anything illicit about them. This was just effective marketing. It was more consistent with modest advertising. I don't know how elastic the word illicit is under the statute, but there's all sorts of dealings under the table. Partners are cutting out partners. Marchetti's involved in all of that. The 50% fee, the 5% . . . That would be the . . . and I'm going to make sure this is pretty up-to-date . . . the K&M global deal and the Kodan deal between Sean Parrish, Nicholas Arroyo, I believe Stephen D'Onofrio, and . . . well, the Kodan was Stephen D'Onofrio and the K&M global. But the whole parking there was it was a consulting arrangement made by . . . Mr. Marchetti may have known, but there's no . . . he had an obligation to tell Mr. Lamb. Lamb says he didn't know, and of course it's in the indictment, he didn't know until the day of trial or the day the indictment came out, that they had this K&M global deal. So Mr. Marchetti's belief was, I'm making a deal for my ALS firm not to get Medicare funds, but to expand the business into different areas. And there was testimony to that respect, but then when they tried to back it up with corroboration, the judge kept that out. So once again, that implicates the good faith instruction, which is not a good faith instruction at all. The good faith instruction that the judge gave omits critical language about an honestly held opinion, honest management decisions, or an honest error. There was error in the fact that these false doctors, one month of false doctors, came into play. That statement is in the Seventh Circuit. The Seventh Circuit is where this appellant was drawn from. They have a sentence in there. There's four parts to the good faith instruction. Good faith is inconsistent with intent and willful. Second, the defendant doesn't bear the burden of good faith. Third, good faith is an honest belief, an honest opinion, honest management position. And then third, or fourth, the one the government got was fraud. There's fraud, evidence of fraud. The jury should consider all of those circumstances. But when the judge submitted that good faith instruction, he basically put his finger on the scale, and all they're going to consider now is the narrative of the government's case, the aspect of what purports to be fraud, and which was, in fact, from Mr. Marchetti's position, actually business decisions that he had made. To what it's business. Not a decision, not a decision to intentionally violate the anti-kickback statute. And as far as the theory of defense instruction goes, early on, there was a pretrial request for an instruction consistent with the early case of United States v. Christo, and this case all devolved into a regulations trial as opposed to a criminal trial. The entire cross-examination and direct examination was based solely on compensation. Compensation was in and of itself doesn't make a per se violation of the anti-kickback statute. There still has to be evidence of some undue influence. There's some undue influence. What exactly was Marchetti doing? What did Marchetti do? What was he doing? I'm talking about the marketing services he provided. Listed in our brief, we listed 12. Mr. Marchetti basically supervises a range of downstream. He's got those independent contractors or representatives. Contractors, and they're following the statute. Not statute, excuse me, the contract. They're following a contract, literally. Yeah. What do you do with the fact, weren't some of these things, I mean, some of these representatives and some of these activity reports fabricated to justify the amount of payment that Ventari was giving to equalize it to the old plan when they were under the new agreement? Well, and the problem with that is, of course, is that Mr. Marchetti didn't fabricate these activity reports. Were there false activity reports? There were false activity reports. Were there false ... Oh no, excuse me, Your Honor. I'm not sure there were false activity reports. There were alleged to be false activity reports. There were the Chipotle reports, the false doctors, the one month of false doctors. But that was one that he signed on without paying attention to it. That was more negligence as opposed to a deliberate decision there. But his interest in those activity reports was to make sure everything was processed properly, that the claims were processed, the claims were paid. He wasn't specifically looking for Medicare. He was looking for commercial as well as Medicare. Well, he was looking for the same payment he would have gotten under the old deal. Which is what they agreed to. Which is what they agreed to. They agreed to with that percentage, and that was that hand-on-arms length agreement in the beginning, that this percentage is what you will get. They tried to maintain that by using the activity reports, but there was no way to reach into a Medicare fund and pulling out money to pay for that. It was the net revenue from the Ventari firm. So, again, I have to turn back to the theory of defense instruction. And I cite the case of Pennington in our case. And this is the problem with not giving a theory of defense instruction in a case like this. The conduct is so close to innocent that you need a theory of defense instruction. As in Pennington, the issue there was the constructive possession of contraband in a vehicle. The defensive theory was to show constructive possession, you have to, I have to know that it was hid there. And they didn't get that instruction on constructive possession. It became now the Pennington charge is routinely given in drug cases. Here, Mr. Marchetti consistently believes, I'm not in violation because for years, even in the beginning, we were getting a net payment and it wasn't in violation of the law. The anti-kickback statute itself does not say I'm in violation of the law. Therefore, I'm acting in good faith and I have reasonable belief in this reasonable belief instruction. And basically what the government does with their percentage-based commission setting up a per se, it requires at least an additional instruction which accounts with the fact that there are not referrals under the anti-kickback statute. So that is akin to that. At this point, I can yield the remainder of my time for the government. The government placed some degree of reliance on the Schumacher case from our circuit and I noticed that in your reply brief, you did not acknowledge that or discuss . . . I know how I overlooked it, but occasionally that happens. That always raises a red flag for me when the reply brief doesn't . . . So tell us about Schumacher. In reading the . . . in fact, there's Schumacher and a case called George out of the Seventh Circuit and I can give you that citation. And Schumacher is almost a paradigm of the exercise of influence in the position of it and Judge Amelia Garza, in his opinion, states carefully that you get to make a distinction between advertising, which is legal, marketing, which is legal, and illegal . . . actually exercise of undue influence over parties. Here, there's no evidence of exercise of undue influence over the parties. The Seventh Circuit followed that opinion in United States v. George and Schumacher is a paradigm of exercising undue influence. There you have two officials moving into a nursing business and direct them to a particular hospital. In George, which is at 900 Fed Third 405, the Seventh Circuit, 2018, they cite Schumacher and they quote Judge Garza's explanation of Miles there, that the conduct must represent an intent to induce referrals. And there's no evidence of any intent to induce referrals in this case. The special agent actually asserted that there was no evidence that there was no payment of doctors and they couldn't find anything. The government's theory was, I think, set out early in the case when the arrangers made it a point, well, if you don't fit within the state harbor, that's a violation of the law. But even the OIG says you have to consider the intent of the parties. If Bantari's intent was to induce referrals via the payments to Marchetti, wouldn't that be enough? No. There have to be illicit referrals. That goes to the, in this company, there has to be some sort of influence. Well, that's the line between marketing versus. Marketing, marketing and sales, but marketing and sales are basically presenting the offer of the service as opposed to arranging the service and then they provide the logistics work, but that's not the same thing as referral and arranging and producing service of that nature. All right, you save time for rebuttal. Thank you, Mr. Turner. Mr. Garcia? May it please the Court. I'd like to start off just addressing a point that I think, that I think was raised upon. We're not starting with a blank slate here. This isn't a referendum between pure sales and marketing activities. The jury was presented with testimony and evidence regarding Mr. Marchetti's knowledge and his willfulness, and in this case, and in AKS cases according to the Fifth Circuit, that willfulness is defined as disobeying or disregarding the law. In this case, the most important evidence of that in the record was that Mr. Marchetti was noticed by several co-conspirators, not just in their conversations with Mr. Marchetti, but also by forwarding him things like advisory opinions, fraud alerts, communications with lawyers, telling him and putting him on notice that the type of pay, the type of pay structure that he was receiving for referrals, not for marketing or advertising services, but for referrals, was viewed by law enforcement agencies, by lawyers, and by co-conspirators as being against the law. What did, what did Marchetti do in the marketing, let's call it marketing activities, the activities that were defined in their agreement, what did he do that takes this case from Miles and puts it into Shoemaker? Sure. So in Shoemaker, so Shoemaker does a, Shoemaker, Gibson, and Crane all limit the holding of Miles. I think it's important to distinguish Miles first on a couple of procedural and substantive elements. First is that Miles was a substantive, a substantive count. It was a violation of the anti-kickback statute, whereas here we have a conspiracy count. The second big distinction between Miles and what, and what we have here and what we have in some of the subsequent cases in the Fifth Circuit is that in Miles, the court was only looking at one prong of the, of the anti-kickback statute, 2BA, and in that subsection of the statute, that is the one that includes an intent to refer. The Miles court specifically said that it wasn't looking at whether the conduct at issue could have possibly violated the two, I'm sorry, the B2B prong, which is something that was charged here as part of the substantive count that underlied the conspiracy count. So as far as like how it, how it moves it from Miles to Schumacher, Schumacher makes that distinction that Miles was only looking at that one prong, and it also talks about that Miles needs to be read as far as intent of the parties, not the, not the. But what did Marchetti do? He wasn't a doctor. He didn't have the patience, right? So he takes materials to the doctor's offices, leaves materials here, you know, call Ventari. He didn't facilitate things, um, like the PR firm did in Miles. Um, so what did he do that was improper or illicit? So here, the charge is that they conspired. So the crime itself is the agreement to violate the anti-kickback statute. Well, but, but a conspiracy to market services and develop business is not illegal. Sure, that, that would, that would be the case as long as there is no unlawful intent or an intent to violate the law. So Schumacher actually has a footnote in, it's footnote 20, and it has, it discusses what this undue influence could mean. And it draws this distinction, or it draws a comparison to how certain state bar organizations treat lawyer solicitations and what brings something, a lawyer solicitation from being, from unduly influencing the, the, the advertising. And one of those distinctions is the fact that it's considered in person, in person, um, has a larger threat of unduly influencing clients. So here though, what, here though, what we need to look at is not, not the role that Marchetti played or, or what were his actions. What was the, what was the agreement of the parties? And here we, what you see is, you see the co-conspirators testifying in court that what they were not trying to pay Mr. Marchetti for marketing services or for advertising services. They were paying him for referrals. And Mr. Marchetti was, uh, there was testimony in Mr. Marchetti that what Mr. Marchetti was and who he hired as far as his sub-distributors were, were sales representatives who had pre-existing relationships with doctors, primarily through some sort of full-time job, selling some sort of other service or other product to those doctors, and that they would leverage that influence, uh, they would leverage that influence in order to convince the doctor to refer Vantari tests and Vantari, and patients to Vantari. So as far as what, what the parties agreed to, it, it wasn't for marketing or advertising services. It was actually for the referrals. And this is, uh, this can be seen through the fact that they entered into these renegotiated contracts, specifically saying that they weren't going to be paid for referrals, specifically saying that things like the activity-based compensation were not going to be for Medicare business. But more importantly, I think some of the subsequent transactions with K&M Global and with Kodon are, uh, are exemplary of the party's actual intent because there, Mr. Marchetti paid a 5% kickback to Mr. Arroyo and Mr. Parrish. Mr. Turner argues and Mr. Marchetti argues that that was for consulting. However, the jury was free to infer that those contracts and the, the language in those contracts regarding marketing shows that Mr. Marchetti, uh, Mr. Marchetti used the same guise of paying for marketing services when he was paying, uh, when he was providing a kickback to Mr. Marchetti, to Mr. Arroyo and Mr. Parrish under the guise of marketing, when in truth, what was happening was they were paying back a portion of the increased commission that Ventari was paying, uh, paying ALS, Mr. Marchetti's company, in order to secure referrals, not because of any sort of marketing services that Mr. Arroyo or Mr. Parrish would, would, um, would provide. So, I'd like to move over to, to some of the arguments that, uh, Mr. Turner raised about theory of defense instruction and the good faith instruction. First, the, the theory of defense instruction, um, you know, the stand, the first, uh, test as to whether, um, a jury instruction when it's omitted, whether there's reversal is mandated, is whether that the instruction is correct. In this case, the theory of defense was not correct. It collapsed the substantive violation and the conspiracy violation and treated the same. In addition, it omitted the language in, uh, subsection B1b and B2b that related to arranging for or recommending the services. So, as a threshold matter, the theory of defense instruction itself was incorrect. Moreover, there was no, there was no argument by the government that, uh, violation of the safe harbor or violation of the advisory opinion or the fraud alert violated the law. That was never the case. The government was always required to prove that under the agreement, the compensation was intended to, uh, induce the referrals or was intended, uh, for a party to recommend Ventari services. So, those instruction, the, the actual instructions were actually covered by the jury's charge under the knowledge and willfulness instruction. Uh, in addition, uh, Mr. Marchetti's counsel was actually allowed in closing to argue this good faith defense and argue that sales and marketing activities are legitimate and they do not violate the law. In fact, over the government's objection, Mr. Marchetti was even allowed to about this idea that if you violate a safe harbor, it doesn't necessarily mean that you're violating the anti-kickback statute, which is a position that the government actually shares. Um, as far as the actual good faith instruction, uh, the good faith instruction that was proposed by, by Mr. Marchetti, one, it, it was represented at court that it, in, in trial that it was pat, it was the pattern of the, the eighth circuit and then at some point it was represented that it was the 11th circuit. It, it didn't actually, it wasn't actually one of those pattern instructions. It was a modified instruction and that modified instruction also suffered from some of the same, um, issues as far as whether it was a correct pattern, a correct instruction because it also conflated conduct and intent and it included a sentence where it asked the jury to acquit if there was any sort of reasonable doubt as to good faith. Not any sort of reasonable doubt as to willfulness, reasonable doubt as to good faith. So, as a threshold matter, the instruction itself was also incorrect. And under the Fifth Circuit's decisions both in, uh, frame and in, uh, and ultimately frames, uh, frames reasoning, framing an unpublished decision and then ultimately in the court's most recent decision on this subject in Shaw, uh, the court adopted this, this same argument that a good faith instruction is not necessary in this context when knowledge and willfulness sufficiently establish what, what the, what must be proven in order for the defendants to be found guilty. And that was the case here as well. Um, as far as, uh, there was also an argument that there was some sort of constructive amendment regarding the, the, the, the, the use of the word fraud at the end of the good faith instruction that was provided by the trial court. Uh, it didn't constructively amend it. As far as the actual language, um, that was used, the language only negated good faith. The language, the, the good faith instruction itself stated that even if good faith, even if the jury finds that there was no good faith, the court, the, the government must still prove that Mr. Marchetti entered into this conspiracy willfully. Uh, and that instruction is referenced in the willfulness instruction of the court. Does the, um, does the government take the position that, uh, Schumacher is consistent with Miles under our rule of orderliness? Obviously, if it is not, then Miles would prevail over Schumacher. So, so the way that Shoemaker has read Miles, I think the issue is it's not, it's not necessarily the, what Miles stands for. It, it, it's more of how Miles is read. So in Schumacher, it makes a, I, I believe it makes an adequate and fair description that Miles isn't establishing some sort of new element that must be met under these anti-kickback statutes. What it's really talking about is it provided one example of when the statute is violated. And in that example, it talked about, um, whenever somebody can corrupt referrals or whether a relevant decision maker, but that doesn't mean that just because this example violates the statute, that that is some sort of requirement. And I think the, the court's subsequent decisions in Schumacher, Gibson and unpublished in Crane, make this distinction, make this, this, make this distinction clear. The real purpose of the anti-kickback statute and what takes innocent conduct that is permissible in other industries and makes it unlawful in the, in the anti-kickback statute, it's really the intent of the parties. And that's why there's so much evidence in this case and in these kinds of cases, trying to go towards, um, towards the defendant's state of mind and its purpose. And that's, that's why things like advisory opinions and fraud alerts, um, and, you know, legal opinions, that, that's why these things are provided in order to, to make sure that the jury considers whether the defendant had the requisite state of mind. And so I think with that, um, any sort of reading in Miles that establishes some sort of new requirement and focuses on, on the, who the parties are, where they are in the transaction, things like that, I, I do think that frustrates the statute. That's not the, that's not how Miles should be read. All right. But we, but again, to, to the extent that they conflict, Miles must override Schumacher under the rule of orderliness if there's a conflict. If there's a conflict, Your Honor, but I, but there, there is no conflict with, with what Miles actually, actually states. Uh, Mr. Turner mentioned, uh, more than once that the statute requires remuneration to be illicit. Specify for us exactly what the government says was the illicit element or part of the remuneration. So here, uh, I, I just want to emphasize again, this wasn't a substantive violation of the statute. So here, what, what, what's really at issue is what was the intent of the parties entering into this, into this agreement? And you see that in, in, and that's evidenced by the Vantari principles, uh, statements and comments and the type of conduct that they engaged in to conceal their action. So for example, in, in the Fifth Circuit's opinion in Ricard, uh, Ricard, the court stated that the jury was free to infer from concealment, misrepresentations, and, and, uh, fraudulent activity that the defendant in that case had, knew that his conduct was unlawful. And that, that's what's evidenced here. As far as what they were expecting him to do, they were expecting him to leverage his influence and access of the doctors to, to send referrals to Vantari. Uh, and I'm sorry, in, in Ricard, it actually mentioned the method of compensation as another reason as to, to why, um, the jury can infer that, that the defendant there knew what he was doing was unlawful. Well, but how did he influence the referrals? I mean, in other words, the doctors are the ones making the referrals, right? So it, it is, that is true in certain aspects of it. There was also an issue with one of the competing labs in Kodan. And it's another example of why, you know, this, this isn't just one piece of evidence. It's a, there's, there's lots of evidence in the record showing, going to Mr. Marchetti's state of mind. So for one example was the arrangement with Kodan. Samples were actually being redirected, uh, from Vant, from going to Vantari to going to Vantari's, um, to Vantari, one of Vantari's competitors, a lab called Althea. And there, there was a, um, an employee named Jessica Kahn who was at a, an Arizona facility who would receive requisition forms, uh, from, from doctors with Vantari, with Vantari, um, lab, uh, referrals. She would transcribe those referrals to an Althea, um, to an Althea requisition form. And then she would repackage them and send them off to Althea. And this was a, a conspiracy that, this was a, a course of conduct by the actors, not just Mr. Marchetti, but another marketer that he, that he, um, that he should have been in competition with, Gene Matrix, uh, and Mr. Arroyo and Mr. Parrish. And so though these are the same, um, kinds of, of patterns of conduct and illicit conduct there where a, a doctor may have referred something to Vantari. However, that was repackaged or resend to a different lab. And then under the same terms of their contract, they were paid not for the marketing or advertising of Althea. They were paid for the referral and the amount of money that they would receive from, from one of the payers. So how did that work? Althea paid Vantari or, and then Vantari paid Marchetti or? Yeah. So Marchetti. So Althea had contracts with Codon DX, um, and with Gene Matrix and Codon DX would then, uh, would then pay a, would pay Codon DX to, to remunerate Mr. Arroyo and Mr. Parrish and would also pay ALS. And special agent Jason Rennie actually testified as to certain financial transactions that were involved between not, not just ALS and Gene Matrix, but also between Codon. And those funds also had, uh, as, as, as a portion of the source of the revenue, the money that Althea was paying these entities for the same referrals. All right. Thank you, Mr. Garcia. Mr. Turner for rebuttal. I'll be brief, Your Honor, I have five minutes. Um, I want to begin with a notion that as I heard counsel saying they didn't have any evidence that Mr. Marchetti, Mr. Marchetti was somehow violating substantively the anti-kickback statute. So they create a conspiracy to make it work. And the agreement is that he has to, knowing them, Mr. Marchetti signed his agreements. Uh, the subject is, is he was at that time knowingly and voluntarily violate the anti-kickback statute. When in fact he entered an agreement to execute marketing and sales activities on the, on the part of Antari. Um, with respect to the, the Codon and Jessica Kahn arrangement, as far as Mr. Marchetti knew, it was this Codon arrangement was going to, it was just basically expanding Mr. Arroyo's business. There was no notion that this was somehow cutting Antari out, save for the fact that Jessica Kahn, and if you read the testimony of Jessica Kahn, brief as it is, the poor unfortunate child shouldn't have, all she did was change basically stamps on a, or, or addresses on samples that were sent in. Mr. Marchetti has nothing to do with that. The queries regarding did Mr. Marchetti actually influence doctors? Again, Special Agent Rennie said he didn't pay any doctors. He had no direct influence over doctors, none at all. With respect to the Miles and Shoemaker, there's a, uh, I think Judge Garza was trying to show consistency in the holding of Miles, that is the influence, the undue influence that makes the, the, uh, remuneration illicit. With respect to the instruction issues, I'm going to, uh, at least cite a number of cases that weren't cited in the briefs in their older cases. One, in fact, I'm familiar with it. It was called United States versus Lufford. Chief Judge Polis was on the case, and, uh, there, after, in reversing the case, they also noted that it is important that the district judge give the instruction on a theory of the defense, and that instruction be precise and accurate, and the government, during the charge conference, mentioned United States versus Fulati. Now, Lufford is found at 9-11, Fed Second, 10-11. It's a 1990 case in which the judge remarks that while an elaborate additional instruction may not be necessary, a defensive theory is best expressed by the judge. A balanced instruction frequently requires such. In Fulati, Judge Higginbotham, citing Judge Brown, says an instruction must be sufficient and precise and specific to enable the jury to recognize and understand the defensive theory test, and test it against the evidence at trial, and then make a definitive decision whether based on that evidence, in light of the defense theory, the defense is guilty or not. In this particular case, the instruction given on good faith basically cut out any evidence of actual good faith, Mr. Marchetti's honest beliefs in his management and the decisions he was making, and focused wholly upon a defense of the government's prosecution. It said basically good faith is inconsistent with knowing and specific intent. It said that the defendant doesn't bear the burden, and it's not good faith if there's evidence of fraud in that, and then they basically cite the government's case which was contested at trial, and the argument was stilted without those defense instructions, without fair defense instructions. So again, the destructions undermined this verdict, we think, and it should be reversed. We also think that there's absolutely no evidence that Mr. Marchetti engaged in any undue influence that violates the anti-kickback statute. He strictly marketed the service provided by Ventari, and there was nothing illegal in that. The Court has no other questions. I'll yield the remainder of my time. All right. Thank you, Mr. Attorney. Your case is under submission.